ELLIS, Judge.
This is a suit by Robert Gilbert Teekel against the Employers Casualty Company, the insurer of Jones-Laughlin Supply Company, under the Workmen’s Compensation Act, Act No.^ 20 of 1914, as amended, wherein he claims compensation not to exceed 400 weeks at the rate of $20.00 per week, subject to a credit of $520.00, and an additional sum-not to exceed $500.00 medical and hospital expenses. The material allegations of the plaintiff’s petition are:
“2 — -That on or about October 28, 1943, while employed by M. W. Kellogg Company in this parish and. state, and while performing services of his employment, complainant received an injury to his back in the area of the 4th and 5th lumbar vertebrae, which injuries disabled him at the time from doing the regular duties of his employment or any other reasonable kind of work for a period of about eighteen (18) to •twenty (20) months; that he finally recovered from said injuries sufficiently to resume his work; that he returned to his regular employment as a carpenter in the spring of 1945 and that he continued his duties in his employment for a little over two years.”
*383 “3 — That on or about July 21, 1947, while employed by Jones & Laughlin Supply Co. upon the premises of said employers place of business in the Parish of East Baton Rouge, State of Louisiana, and while performing the services of his employment, petitioner was struck in the back by a piece of timber falling from the top of a tank, and as a result suffered injury to his back in the area of the lumbar spine, involving the region of the Sth lumbar vertebrae, the 4th lumbar vertebrae and the sacrum, all of such nature and extent that complainant has been prevented from resuming the duties of his employment or resuming any other reasonable kind of work or employment.”
“4 — Complainant further shows that after said injury on July 21, 1947 that complainant was sent to Dr. Charles McVea for examination and treatment; that after Dr. McVea examined and treated him, the doctor advised him to return to work for light duty, which he did do and that he continued to work on the job for about ten (10) days doing light work.”
“5- — Complainant shows that on or about August 1, 1947, while employed by the said Jones & Laughlin Supply Co. on the same job, he was standing upon the scaffold and attempting to place some boards over his head and on top of the next scaffold, when the board he was moving slipped and twisted his body, again causing his back to be wrenched and also immediately causing severe pain in his back; he immediately stopped working and immediately reported the fact to the office manager for ■his employer of being injured again on the job; the said office manager then brought your petitioner back to Dr. McVea who treated complainant until he was referred to an orthopedic surgeon; that Dr. George in the course of his treatment of complainant placed 'him in the Baton Rouge General Hospital for treatment of complainant’s back by traction ‘ in' order to relieve the back pain.”
“6 — Complainant further shows that his doctor required him to wear a steel brace for his back ever since he received the traction treatment in the hospital.”
“7 — Complainant further shows that as a result- of said accidental injuries on the job of his employer that he suffered a low-back strain or sprain along with some osteoarthritis in the region of the 5th lumbar interspace and possibly a. ruptured inter-vertebral disc, as well as the aggravation of' hypertrophic arthritis in the lumbo-sacral region and that as a result thereof he is permanently ‘ .-and totally disabled from doing any work of a reasonable character for which he is fitted by training and experience.”
“8 — Complainant further shows that if the said injuries received by him on July 21 and/or August 1, 1947 were not new injuries created on said dates, that they were the result of an aggravation or recurrence of an old injury which he had previously .received and from which he had apparently recovered.”
The defendant denied all the essential allegations of plaintiff’s petition except the payment of compensation for the period alleged by plaintiff. The defendant, on information and belief, further alleged that the ruptured disc injury was the same injury for which plaintiff sought compensation from the Employers Liability Assurance Corporation, Inc. for which he received a substantial compromise settlement as alleged in its answer, and it denied that any injury from which he may now suffer is a result of any accident sustained by him in July ox August, 1947 while working for Jones & Laughlin Supply Company.
The case was duly tried and the learned Trial Judge, with written reasons, on September 8, 1949 rendered judgment in favor of the defendant dismissing plaintiff’s suit, and the plaintiff has devolutively appealed.
This case involves a question of fact as to whether plaintiff actually had the accidents complained of and, if so, is the plaintiff, as a result of either or both of the alleged accidents, totally and permanently disabled.
The District Judge was of the opinion “that if there was an accident in July 1947 it was of a trivial nature,” and that Dr. McVea’s opinion as shown by his report to the effect that the plaintiff was an out and *384 out malingerer “was reasonable and probably correct,” and he doubted seriously that the accident alleged to have taken place on August 1st ever occurred, “or if any accident did occur, it occurred in the manner stated by the plaintiff.” In view of the plaintiff’s “own admission of falsehood consistently and Tepeatedly indulged in” he, in effect, did not believe anything plaintiff said. It was his opinion that the plaintiff had failed to prove by a preponderance of competent evidence the allegations of his petition.
In arriving at a decision in this case, it will be necessary to review somewhat in detail the entire testimony in this voluminous record as the plaintiff has been proven by the facts and his own admissions of deliberate false and untrue statements to be unworthy of belief.
On October 28, 1943 the plaintiff was employed by M. W. Kellogg Company in the Parish of East Baton Rouge, State of Louisiana, and by petition filed on June 26, 1944 alleged that on or about that date “petitioner was struck in the back by a piece of timber 2x12x16 and as a result suffered injury to his back in the area of the 4th and 5th lumbar vertebrae,” and in another article of this same petition alleged “that upon the day in question and while working under a scaffolding petitioner was suddenly struck in the back by a piece of timber which fell a distance of approximately twelve feet, striking him endways and throwing him with great force to the ground and rendering him unconscious,” and plaintiff therefore prayed for compensation for total and permanent disability in the maximum amount subject to a credit in the sum of $640.00 representing compensation which had previously been paid.
As a result of this accident, plaintiff was admitted to Baton Rouge General Hospital where he was treated by Dr. H. C. Hatcher of Baton Rouge, Louisiana, who stated on 'his surgeon’s report that plaintiff was suffering from “severe traumatic myositis of lumbar back, most on right side,” and under the heading of “Disability” Dr Hatcher stated that “Patient will be able to resume regular work on: 3-4 weeks.”
On October 29, 1943 Dr. Lester J. Williams, Radiologist, made an x-ray examination of plaintiff’s lumbar spine which was negative for fracture or dislocation. In this report to Dr. Hatcher he directed his attention to the fact that the plaintiff’s right transverse process of the second lumbar vertebra had failed to unite with its verterbral base which he stated was a congenital condition and not the result of trauma.
On March 2, 1944 we find in the record a letter addressed to Mr. Fred Benton, Louisiana National Bank Building, Baton Rouge, Louisiana, who represented the plaintiff in the suit against the Kellogg Company, from Dr. T. Jeff McHugh in which he stated that in compliance with his request he had examined the plaintiff and also stated that he had previously examined this plaintiff on November 29, 1943. In this letter or report, Dr. McHugh stated that the plaintiff’s “present complaints” were “that since the accident he has continued to have low back pain which radiates to the right. Further states that the right foot has a tendency to turn outward in walking.” As a result of his examination he further states in this letter or report that his conclusions are:
“There are no abnormal objective findings in the clinical examination.”
“Radiographic examination shows the Sth lumbar vertebra slightly narrower and a little less dense than the other lumbar vertebrae. I am not quite certain that the fifth lumbar is pathological and I should like to have the opinion of Drs. Samuel and Bowie on this point.”
“If the fifth lumbar is pathological there is good reason for his complaint.”
“I have the impression that this man does actually have some trouble but that he exaggerates in order to sell me on his disability.”
“Please advise me if I may incur the additional expenso of x-ray consultation.” (Emphasis added.)
The request of Dr. McHugh to incur the additional expense of an x-ray consultation with Drs. Samuel and Bowie, Radiologists of New Orleans, Louisiana, was granted *385 and bn March 9, 1944 these doctors addressed a statement to Dr. McHugh that “the examination of the films submitted with special reference to the fifth lumbar vertebra shows some slight irregularity of the body of the fifth which we believe is postural as there is no definite evidence of bone pathology to be seen in these radio-graphs.”
On April 3, 1944 in a letter addressed to Mr. Benton, Dr. McHugh stated: “It is my opinion that Mr. Teekel does have a painful back but I am inclined to believe that he does exaggerate the degree. As to the duration of his back pain, I am not prepared to say, and I do believe that an examination by a neurosurgeon such as Dr. Gilbert Anderson or Dr. Dean Echolls would be helpful in arriving at a fair evaluation of his disability.” (Emphasis added.)
On May 13, 1944 we find a written report by Dr. Henry C. Hatcher addressed to the Employers’ Liability Assurance Corporation, the defendant in that suit, in which Dr. Hatcher stated:
“The history is that about 11:30 A.M. on 10/29/43 a piece of 2x12 fell a distance of about 12 feet, and in its fall it grazed Teekel on the head and upper back, but landed full force over the lumbar muscles on the right side. He was sent to my office from the job, but was sent immediately to the Baton Rouge General Hospital, remaining there until 11/9/43. X-ray examination by Dr. L. J. Williams was negative for bony fracture or dislocation.”
“I realized in the beginning that Teekel was painfully hurt, but have never felt he received a serious injury. I recognized early that we were dealing with a tough case, inasmuch as from the beginning, Teekel has talked and felt that 'he would be disabled for a year or more. My file does not reflect any communication with your office, but my notes do indicate that in November 1943 I suggested orthopedic consultation in the case, and this point was developed with you, but the New Orleans office thought it best to continue the treatment here.”
“I have knowledge that Teekel has been examined by Dr. T. Jeff McHugh of Baton Rouge, and probably has ■ been examined by many others. I also understand he has had a lawyer for many months.”
“On 12/30/43 I saw Teekel in a hysterical state. He was very nervous, apprehensive and' complained of severe head ache. He quieted down after a good talk, and this phase was controlled by sedatives. He has and is complaining of pain and weakness of the right lower extremity. He has and' is walking with the foot averted. He complains of numbness in the right lumbar back, pain in the right shoulder on raising the right arm, and shooting pains in the lower right extremity. He has muscular rigidity over the whole back and is unable to stand on the right toes. I cannot tell how much of these findings are real.”
“Teekel has improved within the past three months, but he has so many complaints he is still unable to work. I still think consultation is in order, and I would like for this to be done so as to establish the real condition of Teekel at the present time. My personal opinion of the case is that he has suffered no injury to the bones, the injury was muscular and should have been well months ago, and his condition now is one of traumatic neiwosis versus malingering.” (Emphasis added.)
On May 30, 1944 we have another report as a result of an x-ray examination by Dr. Lester J. Williams in which he stated that Teekel’s lumbar spine was negative for fracture or dislocation.
On June 3, 1944 we have a final report from Dr. Hatcher in which he stated: “The findings on several examinations have been varied, and you will note all symptoms have been subjective in nature. I cannot account for the aches and pains, Mr. Teekel ascribes to his injury, and believe he has recovered sufficiently to resume regular duty. I would like for you to advise Mr. Teekel it will not be necessary for him to report to my office for further treatments.” (Emphasis added.)
On June 4, 1944 we find a letter or report addressed to plaintiff’s counsel from Dr. Dean E. Echolls of Ochsner Clinic in which he stated:
*386 “A neurological examination was made and the back was also examined with the patient undressed. The neurological examination was. negative. The back appeared normal, but there was a slight list to the left on bending forward. All back movements were somewhat limited, especially bending to the left. There was marked tenderness on palpation over the fifth spinous process and over the muscles just to the right of the fifth spine.”
“This man has a rupture of the fourth lumbar or fifth lumbar intervertebral disc. This is the cause of the chronic back pain. The leg pain and other symptoms are the result of pressure on the fifth lumbar or first sacral nerve roots by the ruptured disc.”
“Presumably, this disc was ruptured by the accident which occurred on October 28, 1943. Some patients with ruptured discs, make a spontaneous recovery from symptoms after a period varying from six months to several years. Other patients fail to get well or get worse and must submit to an operation. If this patient fails to get well or gets worse he should come to me for removal of the ruptured portion of the injured disc.”
“A complete set of films of the lumbo-sacral spine were made by Dr. Little. His report is as follows: “ ‘Lumbosacral Spine —There is no evidence of fracture, intrinsic bone disease, arthritis, or congenital defect. A minor finding is that of an area of benign sclerosis in the left ilium bordering on the upper portion of the left sacro-iliac articulation which is not believed to be particularly significant. A very small hy-pertrophic spur is beginning to form at the anterior superior border of the fourth lumbar vertebra and should not be significant.’
“These films are compatible with my diagnosis, inasmuch as films are usually negative in cases of ruptured intervertebral discs.”
On June 22, 1944 Dr. T. Jeff McHugh addressed a- letter to Mr. Fred Benton in which he- stated his conclusions' as the result of-an examination ■ of Teekel on June 20, 1944 to be as follows:
“His complaints are compatible with a diagnosis of- ruptured intervertebral disc.”
“Dr. Dean Echolls, in his report of June 4, 1944, is of the opinion that Teekel has a rupture of the fourth, or fifth lumbar intervertebral disc. In this opinion I concur.”
“I have been of the opinion, from the first examination, that he does have hack pain. However, his eagerness to prove his disability gave me the feeling that he was exaggerating symptoms.”
“It is my belief that he is presently totally disabled, that he should submit to operation which I think will restore him to his former physical ability. This belief is predicated on no complications arising in the operation.”
It is clear that the diagnosis of ruptured disc as a result of the accident while working for the Kellogg Company was made on subjective findings as all x-rays were negative and the physical examinations were the same. It will be noted that throughout the reports the various doctors frankly stated that they believed Teekel was exaggerating his symptoms, and Dr. Hatcher, on May 13, 1944, believed that Teekel’s condition at that time was one of “traumatic neurosis versus malingering.”
As the result of Dr. Echolls diagnosis, plaintiff’s attorney addressed a letter.to the attorneys for defendant in which he stated that Teekel wanted to compromise the case and take advantage of an operation by Dr. Dean H. Echolls. In this letter he stated: “If it were not for Mr. Teekel’s desire to get sufficient money to undergo the said' operation now and for the reasonably high expectation that he will be restored by the operation to a reasonably sound physical condition, I could not conscientiously recommend a compromise at the figure shown. If the case is to be settled upon this basis Mr. Teekel wants to proceed immediately as any further delay now will serve no useful purposes in relationship to the operative process outlined by Dr. Ec-holls in the testimony'which he gave in this case, * * *99
The defendant accepted the offer of compromise and such judgment was according *387 ly signed on the Sth day of October, 1944, awarding Teekel $2500.00 in full settlement.
After the- settlement, the plaintiff did not take the operation but made a “spontaneous recovery” and we next find him in the early part of 1945 working for the Crawford Lumber Company. Dr. Moss Banner-man testified that plaintiff told him that about thirteen months after he was injured the radiating pain down his right leg cleared ttp spontaneously. The plaintiff did not exactly deny that he had made this statement but stated “I would not say in 13 months exactly, maybe a little more or less. I think a little less. I am not sure.” At any rate, he was working within 60 to 90 days after the settlement and he continued to work for Crawford Lumber Company for eléven months and stated that he was able to do the same work required of him as when injured.
He next worked as a carpenter for J. M. King, a contractor, building on a house with other carpenters. He then worked for a contractor, whose name he could not remember, building houses in Istrouma, but he did remember that the foreman’s name was Wainwright. It was while working here that plaintiff slightly injured his finger for which he later sued the Superior Insurance Company for six weeks compensation, which suit was dismissed on a plea of prescription and which plaintiff explained had been dismissed because “The time had run out unbeknowest to me.”
Plaintiff next worked for the Austin Bridge Company and while on this job suffered some slight injury or wound to .his leg. He then worked for McGee. He next applied and obtained work with the Delta Tank Manufacturing Company of Baton Rouge where he was required to fill out an application and take a physical examination.
It will be noted that plaintiff when asked about the places he had been subsequently employed since the accident of 1943 did not name the Delta Tank Manufacturing Company. In fact, after naming his various employers down to McGee he was asked by his counsel:
“Q. Is McGee the only company you worked for before you went to work for Jones & Laughlin? A. Yes.”
It is. strange that he did not name the Delta Tank Manufacturing Company. In view of the fact that the information given by him in the application to the Delta Tank Manufacturing Company was largely deliberately falsified we believe he “conveniently” forgot that he had ever worked for. that .company.
This record is voluminous and the case was tried from time to time. It will be noted that under cross examination Teekel was asked about working for the Delta Tank Company. It was definitely shown that he went to work for them September 19, 1946 and worked for them until the latter part of October, 1946. He was cross examined on the information he' gave in answer to the questions shown on his application one of which was: “Have you ever been injured on any job,” and he answered, “No.” At this time Teekel stated that he could not recall such a question and did not remember saying that. Another question was, “How much time have you ■lost from work on account of sickness in the past two years,” to which he answered, “None.” His explanation of this answer was that he did not remember, that he did not recall having said that.
He was again pressed on cross examination as follows:
“Q. Mr. Teekel, I expect to be able to prove by the original application that you, yourself, signed that one of the questions asked — I mean out at Delta Tank in September of 1946 — one of the questions asked was this: ‘Have you ever been injured on any job.’ There was a place to check yes and a place to check no, and you checked no. If you did that, why did you do it? A. Maybe I. just check either one of the checking places. I can’t read. Maybe I just marked either one of the blank places.
“Q. In other words, you think you might have marked ‘No’ by mistake? Is that right? A. I would not have said no if I had understood.
“Q. If you did say no, it is because you misunderstood the question and misunderstood the place you were -to make your check mark? Is that your testimony now? A. Yes. I don’t remember. I can’t read.”
*388 Another question on the application was, “How much time have' you lost from work-on account of sickness in the past two years”,-and a zero was written in answer to this question. Teekel .could give no explanation as to why he had caused a zero to be placed in answer to the question.
After the question, “Have you ever been injured on any job”, there was a place to check “yes” or “no”, and the next question stated, “If so, state name of company.” This was left blank. Teekel’s explanation was that he did not recall that; that he couldn’t read and didn’t understand it. He just marked one blank or the other. He couldn’t explain why he had left blank questions which stated “Nature of injury,” and in answer to the question “Did you draw compensation” neither “yes” nor “no” was checked. His explanation was "I couldn’t read it.1*
Teekel was then asked “Do you remember telling the people who wrote this application for you, filled it in, that you had had military service. That question was answered and checked ‘yes.’ ” A. Military Service?
“Q. Yes. A. I ain’t never had no military service.
“Q. The question is, ‘Have you ever had military service?’ and two places to check yes and no, and yes is checked. Is that correct? A. I never had military service.
“Q. Were you ever discharged from the Army? A. No, I never was in the Army.
“Q. The next question is, ‘If so, what type of discharge have you?’ A. I haven’t, never been in the Army.
Teekel was later cross examined when the case was again heard on March 6, 1949 as to his application for employment with the Delta Tank Manufacturing Company. We quote:
' “Q. I now show you what purports to be an application for employment to the Delta Tank Manufacturing Company and ask you to examine it, both sides if you wish, and ask you if it bears your signature? A. Yes, sir, I signed that Mr. Hardin.
“Q. Did-you sign that when you applied for employment to the Delta Tank Manufacturing Company? A. Yes.
“Q. Before you signed it were you questioned by someone and the application filled out in keeping with your answers to the questions? A. Yes.
“Q. I notice on the application on the page that bears your signature it says under ‘When employed’ 1942 to 1944, ‘number of years — 2’, ‘Kind of Work’, ‘contracting for self.’ Why did you conceal the fact you had been working for the M. W. Kellogg Company during that time ? A. Well, I will tell you. I wanted a job to keep my family from starving or going hungry.
“Q. You did in fact give a false answer in that application as to what you were doing between 1942 and 1944, didn’t you? A. I did, because I wanted work to keep my family from going hungry.
“Q. At the bottom you stated you worked for M. W. Kellogg Company for seventeen months in 1941 and 1942, didn’t you? A. Yes.
“Q. You made this application on September 18, 1946, didn’t you? There’s the date on the first page up at the top, A. That’s right.
******
“Q. Now, according to the testimony you gave in this case sometime ago- you claim that after about thirteen months you got all right. I am talking about the first accident you had back in 1943, and you were asked what company you went to work for. You said you went to work for the Crawford Lumber Company and worked for them about eleven months. You said that was in the early part of 1945. Why didn’t you put that on your application to Delta Tank, that you worked for about eleven months for the Crawford Company. Look on there and see if it is on there. A. Mr. Gladney, come show me.
By Mr. Gladney:
“Q. Can’t you read? A. Not much.
“Q. Well, can you read it? This shows ‘When employed — 6 months — carpenter— $1.625 — Austin Bridge Company. Didn’t *389 want to transfer* as the ‘Reason for leaving’. The next item is ‘When employed’ and it shows ‘1945’ and under ‘number of years’ it has '5 months’, 'Carpenter, $1.75, Istrouma subdivision, Baton Rouge’, and ‘The reason for leaving’ is ‘finished’. Then I show you ‘1944 to 1945’ ‘contracting for self’ for ‘2 years.’ ■ Then I show you ‘1944’, TO months’ as ‘Army-Engineer’. Then I show you ‘1942 to 1944’, ‘2 years’, ‘contracting for self’. Then ‘1941 to 1942,’ ‘17 riionths’ as ‘Carpenter’ at ‘$1.82’ for ‘Kellogg Company, Baton Rouge’, and under ‘reason for leaving’, ‘completed’. That’s what the application reads, Mr. Teekel.” (Emphasis added.)
“By Mr. Hardin:
“Q. Why is it you concealed the fact you had worked for the Crawford Company about eleven months? A. Well, I never thought about even mentioning it.
******
“Q. I show you another document that is called ‘Pre-employment and physical examination’ from Delta Tank, consisting of two halves, and ask you particularly if you' signed the left half of it under the heading ‘Application’? A. Well, I signed it.
“Q. Before you signed it were you asked questions so that it could be filled out? A. Yes, sir.
“Q. Did you asnwer the questions? A. Yes, sir.
“Q. Was it filled out in keeping with your answers? A. Yes, sir.
“Q. Then after that you signed it?-A. Yes, sir.
******
“Q. I think I asked you once before if you had ever been in the military Service and I believe you told me you had not. What about that ? A. I have not.
“Q. Why was it on the application that you signed for Delta Tank that I have just showed you, in answer to the question, ‘Have you ever had military service ?’ they checked ‘yes’ for the answer? A. I must have told them yes.
“Q. Why did you tell them that if you never had been in military service? A. I wanted a job to keep my family from going hungry.
“By Thé Court:
“Q. You thought it would help you get a job if you told them you had been in the military service? A. Yes. '
“By Mr. Hardin:
“Q. And you even told them you had an honorable discharge on account of your age? A. Yes, sir, is it on theré?
“Q. Yes. The question is ‘If so, what type of discharge have you ?’ and this is the answer typed in ‘honorable-age’. Is that what you told them ? A. Yes, sir.
“Q. On this other application that you signed, I find this question No. TOA, ‘Were you ever in the United States Military or Naval Service, domestic o;r foreign’ the answer given is ‘yes.’ Did you tell them that? A. Yes. ' '
“Q. That was a lie, wasn’t it? A. That was wrong. '
“Q. It was just a deliberate lie, wasn’t it? A. I wanted a job, and the reason was I thought I could get a job. I didn’t want my family to go hungry.
“In this same first application it says, ‘If so, state experience’, meaning what experience you had in military or naval service, and written in there it says, ‘Army ten months and five days’, Did you tell them that? A. Yes.
“Q. It goes on to say, ‘Were all discharges granted under honorable conditions?’ and the answer is ‘Yes’., Did you tell them that? A. Yes.
“Q. It says, ‘State reasons for being granted discharge’ and the answer- is typed in‘Age’. Did you tell them that ?' A. Yes.
“Q. It says, ‘When discharged?’ and the answer is given ‘12/15/44’. Did you tell them that? A. Yes.
“Q. Where it says, ‘Serial number of enlistment’, there is a blank. You didn’t give them any serial number, did you ? A. No-, sir.
“By The Court:
“Q. Why didn’t you give them a number, you couldn’t think up one? A. No, sir.
*390 “By Mr. Hardin:
“Q. Did you ever tell any of the other people you worked for you had been in the military service ten months and five days and had an honorable discharge on account of your age and you were discharged on December IS, 1944? A. I don’t remember; it has been so long.
“Q. Why did you think you had to tell them that; why did you think you had to tell that to the Delta Tank Company? A. I wanted a job building forms.
“By The Court:
“Q. Why did you think it would help you to say you had been in the Army? A. I thought that they would give me a job quicker and I didn’t want my family to go hungry. I thought they would give me a job quicker and keep me longer.”
Thus, Teekel changed his testimony as to why he had deliberately falsified in his answers to the application for employment with the Delta Tank people. His reasons for not giving the same explanation when questioned three months before about this application was “My recollection ain’t too good," and what we believe to be the milk in the cocoanut is that he admits that his attorney had consulted the Delta Tank people with regard to the manner in which the applications were written and signed and told Teekel, who then gave the explanation that he did not want his family to go hungry.
It is further shown that Teekel did not say anything to- Dr. Ross, examining physician for the Delta Tank Company about having 'been hurt in 1943. It is further shown that plaintiff, on December 29, 1944, made application for hospitalization insurance with the United Benefit Life Insurance Company. Question No. 10 in this application is “Have you or your dependents ever had any other sickness for which operation was advised?” to which Teekel answered “No.” Question No. 12: “Have you or any of your dependents received any other medical or surgical treatment within the last five years,” to which Teekel answered “Yes, Feb. — 44 for adenoids lasting one week — Mrs. Teekel.”
There is another application by Teekel to the Mutual Benefit Health and Accident Association for insurance on the 16th day of May, 1945. Question No. 11 in this application is “Have you ever made claim for or received indemnity on account of any injury or illness? If so, what compensation, dates, amounts and costs,” to which Teekel answered “None.” Question No. 13 was, “Are you sound physically and mentally,” to which Teekel answered “Yes.” Question No. 15 was “Have you received medical or surgical treatment or had any local o.r constitutional disease not mentioned above within the last five years? Answer as to each,” to which Teekel answered “No.”
On March 25, 1946 Teekel applied for hospitalization insurance with the United Benefit Life Insurance Company. Question No. 8 on the application is “Are you and your dependents now in good health and free from any physical impairments or deformity?” Answer, “Yes.” Question 10: “Have you or your dependents ever had any other sickness for which operation was advised,” to which Teekel answered "No.” Question No. 12: “Have you or any of your dependents received any medical or surgical treatment within the last five years.” Answer “Yes.”, with no. further explanation which, according to our interpretation would refer to the answer to question 11 wherein it is shown that Mrs. Teekel had an operation in March, 1946.
We believe that the testimony in this record and that which we have specifically commented upon or noted is sufficient to say that Teekel is unworthy of belief. We believe that he was a malinger as to the 1943 accident and that the preponderance of the testimony is against Dr. Echolls’ diagnosis. The fact that he had no subjective symptoms of a ruptured disc and most of the doctors openly stated that they felt he was exaggerating his symptoms and the x-rays were negative as to any fractures, dislocations or ruptured disc together with the fact that he made such a spontaneous recovery, that is, thirty to sixty days after receiving settlement, and continued to work from approximately the first part of 1945 to the date of his last alleged accident on *391 August 1, 1947 with no complaints and m a satisfactory manner, is sufficient for us to accept the diagnosis of Dr. Hatcher on the 1943 accident that he was a malingerer.
This brings us to the alleged accident and injury for which he is now seeking compensation for total and permanent disability. Counsel for plaintiff in his brief, contends that there is no doubt that Teekel was totally and permanently disabled from aggravated arthritis and from reactivated ruptured disc, or from either or both of them. We have already quoted the allegations of plaintiff’s petition as to how he sustained the injury. His testimony on this point is as follows:
“Q. About how long did you work for Jones-Laughlin Supply Company? A. From that time until July 21, 1947. Berge-ron was throwing timber, 2 x 12s, off and me and this fellow, Morgan, was toting them out and he got overbalanced and let it slip on my back from the top of the tank.
“Q. Were you able to see Bergeron? A. No, not when he was under there.
“Q. Now when he was under where? A. Not when he was under the scaffold.
“Q. How did you know he got overbalanced? A. He did not holler until he turned the plank aloose and it struck me, and the fellow standing just outside, I am not sure, I think it was Guerin, hollered, ‘Look out’, and it was too late and it had already struck me.
“Q. What part of your body did it hit? A. By my belt, and went down and hit both legs, and hit my feet.
“Q. What position were you in? A. Like this with my 2 x 12 (indicating) Just as I cleared the opening it struck me in my spine, and come on down and hit this leg and this leg. (Indicating both legs)” (Ern-hasis added.)
Teekel then was asked the following questions and gave the following answers:
“Q. And what did Dr. McVea advise you about going back to work ? A. I told him what happened, and he looked at my legs, and my legs were hurting me and I think I told him about my back, I am not sure, and he doctored me up, doctored my legs and did not pay too much attention about what I said about my back.
“Q. Did he advise you to go back to work? A. On light duty. I could go on light duty.
“Q. Did you do that ? A. I went back that afternoon and I believe I went back out the next day and I think I laid off a couple of days. I am not positive just how many days, but one or two. And then, I went back to light duty and went back to work at light duty and I continued light duty until the first day of August. I was doing light duty in the morning, and they were in a big hurry to move the scaffold and—
“Q. Who put you on light duty? A. Mr. Houston.” (Emphasis added.)
Dr. McVea’s report is in the record, as well as his testimony, and both show that Teekel did not tell him anything about his back having been struck. The first report shows that Teekel told him “a piece of lumber fell on my legs” and under the head of “The Accident” was “Date of Accident: About 7/21/47.” “Hour-1/30 P.M.” No 5: “State in patient’s own words where and how accident occurred: I hurt my back when a piece of lumber fell on my legs.”
Dr. McVea’s report shows that he advised the plaintiff to return to work on July 22, 1947 and he testified that he did not tell him anything about “light work.”
There was a poor effort made by his foreman, Bergeron, to substantiate Teekel in his statement that he went back to light work. It appears from the record that Teekel went back to work and continued to do the same work he had been doing. Teek-el claims that he continued light duty until the first day of August and that he was doing this light duty in the tnorning when it became necessary to move a scaffolding. As to the accident on August 1st? he testified:
“The first of August I was still on light duty and they were in a hurry to move the scaffold and I had a good ladder and goes up the ladder to help Mr. Morgan move the scaffold from the ten foot level to the fifteen foot level a five foot space, and while moving we turned the board over from each *392 side on a ten foot scaffold so we have to get our boards out for room and I was picking the board, up, one end was up and I got back and I got the other end and went to put it up and the board turned with me and I stepped on this other board, looking up, and the board was pretty heavy and when I did I stepped on this loose board turned on the other side of the scaffold and twisted my body, twisted my ankle over and wrenched my back and I told Mr. Morgan, ‘Oh, my back’, and I grabbed my back. I turned blind and then I came down.. I sat down for a few minutes until they got a truck over there. Mr. Brown brought me to Dr. McVea again. If I am not mistaken it was on August 1, about on Friday. Dr. McVea treated me and I went back to him on Monday.”
It is very strange that if plaintiff suffered this alleged accident on August 1st that when he went to Dr. McVea on August 4, 1947 Dr. McVea’s report in listing the date of the accident gives July 21, 1947 and Teekel’s statement that “I hurt my bade when a piece of lumber fell on my legs.” Clearly Teekel on that date was referring to the accident of July 21, 1947 and could not possibly have been referring to any accident on August 1, 1947 for there is no contention made by Teekel that any lumber fell on his legs on August 1, 1947. Also, his testimony is not in accordance with the allegations of his petition.
As to the alleged accident of August 1, 1947, no one saw this accident except one fellow employer, Drew Morgan, who was working with him and who testified as follows: “Well, somewheres around the 2nd or third day he decided to help me move scaffold boards and we were moving it up from ten to fifteen feet and we were transferring the boards from ten to fifteen and Mr. Teekgl stepped on a board and said he wrenched his back and he said, ‘Oh, my back’, and he got down immediately and went to a doctor and did not return to work any more.”
He further testified that Teekel had moved a few boards and then he stepped on a board and “creaned” his ankle and said “Oh, my back.” He further testified:
“Q. Did you see that happen? A. No.
“Q. You are certain and you swear that you saw him turn his ankle before he said he wrenched his back? A. Yes.”
This is the strongest corroborating testimony of Teekel’s alleged accident on August 1st. We don’t think the testimony is sufficient to prove that Teekel had a second accident as alleged on August 1, 1947.
As to the first alleged accident, the witness Drew Morgan testified:
“Q. Will you tell the' Court what happened? A. Yes, the first time Mr. Teek-el got hurt he and I were moving 2 x 12s from under a scaffold which Albert Ber-geron was throwing boards down. Mr. Teekel and myself was carrying them, stacking them on a pile and Bergeron got over-balanced while carrying a 2 x 12 approximately sixteen foot long. Bergeron dropped the 2x 12 which struck Mr. Teekel somewhere in the back, slid down his body to his heels and the only bruised places I seen was on Mr. Teekel’s legs, and the second time * * *
“Q. Did you see that board striking Mr. Teekel? A. I did.”
The witness Bergeron who was the only other eyewitness that was available and testified as to the accident had the following to say:
“Q. Will you tell and describe exactly what you know about the accident? A. Well, Teekel and one of the carpenters, another carpenter by the name of Gill Guerin, and a fellow by the name of Drew Morgan was erecting a scaffold around tanks, which I guess were storage tanks for wax. They erected them and took them down, using safe-way scaffolds which is pipe scaffolding that comes all in sections of five feet each. These three mens were erecting these scaffolds around these tanks for the brick masons to work on. They were getting ready to put around tile bricks, for insulation I imagine. It was around July, about the 21st, everyone was saying they was getting a little tired, so I decided I would help them tear down this scaffold which was around the tank, approximately 25 feet, exactly 25 feet wide, which was made of 2 x 12s, 14 feet long, *393 made of heavy pine boards which had a lot of mortar and cement which is' excess weight on there, so Guerin and I went up top to throw the hoards down and left Teekel and Morgan to watch on the ground so if any of the Standard Oil Employees, or any other employees, would come near that place they would warn them so the boards would not hit them. When throwing these boards down some would fall crosswise and some would fall straight. Whenever it looked like anyone was coming near where Teekel or Morgan was, they would warn them to go around or holler' on me to hold the board. It was pretty hot and they were all pretty tired, and I had one of the boards in my hand hanging over the scaffold, and I did not hear anyone holler to hold or throw it, so thinking everything was clear, I let the board go. The board started down and just as it did, I noticed, I seen Teekel laying over to straighten one of the board out. But it fell crosswise, but it was too ■late. I had released the board. I hollered ‘Watch out,’ and it was too late. I seen the board hit him right about the shoulder and slide down his back and hit him on the legs. There was a long stair leading from the top of the tank down to the bottom and immediately Guerin and I ran down as fast as we could to see if he was hurt, figuring he was hurt. These boards are pretty heavy. Well, when I got to the bottom I saw him and I caught him around the back as I figured he was hurt in the back. He said his back was hurting. I asked him if he was hurt. We picked him up. He helped himself a little. I asked what hurt him and he said his back hurt. I pulled up his pants and both legs were bruised. We walked him around a little to see if there was any other injuries. He complained to be suffering very much so I walked into the little temporary office we had there, the main office of the job is about three blocks south of that, and I called a fellow up by the name of Brown. I called the office and he answered. I told him a carpenter had got hurt, to send a pickup truck over and take him to the doctor. Immediately they came over and got him.”
In addition to Dr. McVea’s report and testimony that Teekel never told him about having been struck in' the back and that, furthermore, on August 1, 1947' when he went to see Dr. McVea he never told him about any accident as having happened on that date as alleged, we find in Dr. McVea’s testimony the following:
“Q. What history, if any, did Mr. Teefi> el give you when you saw him on July 21, 1947? A. Mr. Teekel stated that a piece of lumber had fallen on his legs and hurt his legs.
» “Q. Did you find any physical evidence of injury to either of his legs? A. No, sir.
“Q. What did you find? A. He had some bruises and abrasions on the front portion of both legs.
“Q. Did Mr. Teekel at that time make any complaint of any injury to his back? A. I have no record of any complaint.
“Q. If he had made such a complaint would it have been your custom to record it or not? A. Yes, sir.” (Emphasis added.)
This is the only testimony we find in the record as to where the bruises and abrasions on the legs were, and it is conclusive proof that this board did not strike the plaintiff on the back for it is impossible for us to visualize a board coming off of a scaffold, striking a man either around his shoulders or his belt on. his back and going down his legs and causing abrasions on the front of his legs.
We think that Teekel has proven an accident on July 21, 1947 but in order to accept his story as well as the story of Morgan and Bergeron, his two co-employees who testified they were present at the time that the board struck him in the back, we must disregard this positive testimony of Dr. McVea that the bruises and abrasions were on the front portions of both legs. We cannot see how Teekel’s testimony can be reconciled with Dr. McVea’s.
In addition to the testimony given, Teek-el has offered the testimony of some lay witnesses. There is no doubt that all of their testimony in regard to the accident is what Teekel himself told them. Either their memory was poor or Teekel did not tell them the same story. Most of them *394 knew nothing- of the 1943 accident and subsequent settlement.
One of the lay witnesses, Netterville, who had known Teekel for “ten or 12, 14 years” and who lived fifteen or twenty blocks from him and passed his house “two Sundays out of every three and picked him up and carried him to church and Sunday School and I see him once or twice a week every week * * testified on May 6, 1948 as follows:
“Q. When did you first notice this abnormal physical condition of Mr. Teekel’s? A. Well, now, you are trying to hem me up on dates and I don’t remember any dates particularly, but I should say somewhere along in about — I should say — in the latter part of 1943 — something like that. I would not say that is the proper date— somewhere about that time I noticed Mr. Teekel wasn’t normal like he should have been.”
“Q. Would you know if he has been back at work since 1943 ? A. No, if he has I don’t know anything about it.
“The Court: ,Mr. Teekel, don’t do that. He is making expressions on his face .of approval and disapproval. Don’t do that, Mr. Teekel.”
The lay witness, Hurst, frankly stated that he was testifying as to what Teekel had told him and:it appears that Teekel just told him he was hurt once on the Jones-Laughlin job and then, approximately two weeks before the trial, Teekel told him that he got hurt twice on the job but he never did tell him that he had gotten a back injury in 1943 nor that he had ever collected compensation.
Another lay witness, Lott, testified that he had known Teekel since the middle of 1941 and that he had seen him since the middle of 1947 once or twice a week and that they belonged to the same church and attended Brotherhood meetings and that he had attempted to help Teekel ,by giving him a job of holding an electric cord which was attached to a sanding machine out of his way while he used this machine 'but that he told Teekel he would be better off at home as he was not able to walk around on the floor. He testified that Teekel seemed to be constantly in pain and that he knew about his 'getting hurt in 1943 but that it seemed to him that “Brother Teekel was in pretty good shape right after that time he got hurt in 1943” and that according to his recollection Teekel was just off two or three days “as a result of the 1943 accident when he was working for the Kellogg company” but that he never knew that Teekel had filed suit or collected $3140 as a result of the 1943 accident.
It is useless to discuss the lay testimony any further as it is all about the same caliber.
The record further shows that Teekel had a policy of sick and accident insurance with the Mutual Benefit Health and Accident Association and that it had lapsed on July 1, 1947 and, accordingly, on August 1, 1947 (the accidents are alleged to have occurred on July 21, 1947 and August 1, 1947) Teekel went to the office of the company to pay his dues and said nothing at all about claiming to have had any accident or injury during the time the policy was not in benefit. He thereafter made a claim as a result of the alleged accident and injury now before the Court, which he finally settled by way of compromise for $150.00.
Furthermore, on August 6, 1947 he employed his present attorney without making any claim for compensation and despite the fact that he had been successful in his suit against the Kellogg Company in 1943 and at that time liis attorney was Mr. Fred Benton of Baton Rouge. Also, it would seem likely, if he was honest and sincere in his claim that he would have come back or requested that he ,be sent back to the samé doctors and especially Dr. McHugh whose name was on the same door as Dr. George’s, whom he selected to treat him. As to selecting a different attorney,' with certainly no aspersions on his present attorney, he explained this by saying that he had been to Mr. Gladney prior to the time that the latter had gone into the Army, and that at the time of the 1943 accident and claim his present attorney was still in the army. Be that as it may, it appears that insofar as Teekel was concerned, he was avoiding nearly everyone who had anything to do with the 1943 accident.
*395 It is shown that Teekel was paid for 32 weeks compensation by reason of the fact that he had gone to Dr. J. L. George of Baton Rouge, who told counsel for defendant that he thought he could do him some good and asked if they would pay for the treatment. The defendant insurance company agreed to do this and as a result he put him in the hospital and used traction on his leg, and 'when he was discharged from the hospital he was told to wear a low back brace, which he did. Dr. George in the beginning was of the opinion that Teekel would be well in from three to six months “if he followed the normal course of most injuries of that kind.” He admitted that Teekel apparently had not improved at all and that his subjective symptoms were “a slight bit of atrophy in the right calf, the circumference of the right being % inch less than the left,” but when asked if he thought such atrophy was due to an accident as recent as July 21, 1947 he very frankly answered “No, you don’t get atrophy within a weeks time.” He outlined a few other objective symptoms but admitted many inconsistencies from time to time in Teekel’s complaints and location of his pains, and in some of the various tests which he made. Teekel did not tell Dr. George that he had ever been to Dr. McHugh for the 1943 accident and injury nor that he had been to Dr. Henry C. Hatcher, and Dr. George had never discussed his case with these doctors. Teekel told Dr. George that he was treated by Dr. Echolls in New Orleans “who told him there was a nerve loose in his back. His back was injected and within three months his 'back was sound and well.” This is denied by Dr. Echolls and was evidently untrue. Dr. George frankly stated that he accepted as correct the history Teekel gave him and that his treatment and examination and all the conclusions which he reached were based on the assumption that the complaints of pain made by Teekel were honest and true, and that if the statement of Teekel that he was struck by a 2 x 12 was completely untrue and-he had not been struck in the back at all ■but had been hit on the leg, his conclusions would not have been the same.
After reading all of Dr. George’s testimony and the fact that it was necessary to depend upon Teekel’s word, and his findings were based upon an acceptance of Teekel’s statements and complaints ás true, we do not think that it is of much value to the plaintiff.
Dr. Bannerman in his report of March 8, 1948 was of the impression that Teekel was suffering from arthritis, hypertrophic lumbosacral region aggravated by injury, and was of the opinion that he was not able to return to the type of work he was doing at the time he was injured, but could not estimate the duration of his disability. He was of the opinion that a recovery would occur without surgery. He could not at that time find any involvement of a disc with pressure on the nerve, and felt it highly doubtful that such existed or required treatment. Dr. Bannerman gave the following testimony:
“Q. I ask you that because Dr. George has testified that when he last saw Mr. Teekel there were no objective' symptoms whatever, no spasms, no objective symptoms, and that if he were to discount the subjective complaints he would conclude there was nothing the matter with Mr Teek-el and if there had, he had recovered. Would you like to add anything? A. I would have nothing to add to what he ’ said. If there were no objective findings in the way of muscle spasms I would be inclined to discount subjective symptoms.”
Dr. Bannerman’s testimony is, therefore, of slight value to the plaintiff.
Dr. McVea rendered a report on August 9, 1947 which sums up his opinion on this case. It is as follows:
, ,“I have had under'my treatment Mr. R. G. Teekel, who works for the Jones and Laughlin Supply Company. I mailed you an initial report on this man on August 4, 1947, at which time I had made a diagnosis of right sacro-iliac strain. I have investigated this man thoroughly and have seen him on some four occasions, and it is my opinion that this man is a malingerer. I have discussed his case with the Jones and Laughlin people here in Baton Rouge and *396 have referred Mr. Teekel back to them so that he may seek medical advice elsewhere. Mr. Teekel’s story is that he-hurt his back when a piece of lumber fell on his leg about 7/21/47. I saw .him at that time, but not for that complaint. At the time I saw him on 7/21/47 he had contusions and brush-burns of both legs, which cleared up rapidly and he was able to resume work. At the time he first came in to see me he had absolutely nó complaint of back pain. The second time he came in to see me was on the first of August, and that is the report which was mailed to you on August 4th.”
"“On his examination on August 1st, 1947 his complaint was of pain in his back when he stooped over and of inability to move about as freely as he had been able to prior to his accident on July 21st. Examination at that time revealed normal reflexes and no loss of sensation in his legs or in his back. All tests of back injury were grossly exaggerated in the response by this patient. .He complained bitterly when lying on his stomach of having his legs flexed at the knees, a procedure which could not possibly have given him pain in his back. Straight legs raising tests on both sides were positive, and he vigorously resisted any attempts at movement of his legs. He limped and held his back in a bent over position while he was in my office. The position he assumed could not possibly have given him any ease if his back had been injured, but would have aggravated any injury and made his back hurt worse. He complained of pain 'in the region of the right sacroiliac joint, but did not complain of pain elsewhere in the back. X-ray examination of his back revealed some mild arthritic changes in upper third of left sacro-iliac articulation. There were no other findings on x-ray.”
“It is my opinion that this man is an out- and-out malingerer, and does not have any disability as the result of injury to his back at this time. I am sending you final report and bill in with this letter.”
Dr. 'Echolls did not re-examine Teekel hut it was his opinion that he was, suffering from the intervertebral disc which was ruptured as a result of the accident in 1943.
X-rays were made of Teekel’s back as a result of the alleged 1943 accident and were also made as a result of the alleged 1947 accident. Dr. Dorothy Mattingly took some x-rays of Teekel on August 5, 1947 which showed no evidence of fracture or dislocation but did show clouding on upper Vis of left sacro-iliac articulation and there is a one-half synometer tilt of pelvis. Impression, mild arthritic changes in upper one-third of left sacro-iliac articulation.
On cross examination, Dr. Me Vea testified with regard to this report from Dr. Mattingly which indicated that Teekel did have some arthritic condition in his back but which could not have been the basis of his complaints for his complaints were on the right side while the arthritis was all in the left side. This was another reason why he did not believe Teekel’s story.
Dr. Lester J. Williams, radiologist, was shown radiographs dated August 5, 1947 of the lumbar spine and pelvis of Teekel and stated that there was a hypertrophic arthritis of the left sacro-iliac articulation with some proliferation or increase of bone density in the upper segment of the left sacroiliac articulation, and further stated that there was no fracture or dislocation. He was shown radiographs made on March 25, 1949 which showed practically the same condition as in the previous pictures. However, he noticed “a slight narrowing on the right side between the third and fourth ■lumbar vertebrae” which might indicate a possibility that there was a disturbance of the discs between the two vertebrae, that is, a possible rupture.
On April 5, 1949 Dr. Williams- took some x-rays of Teekel himself and stated that the radiographs showed a narrowing of the articulation between the third and fourth lumbar vertebrae" on, the right side but no evidence of fracture or dislocation, and that this narrowing could possibly be due to a ruptured disc.
Dr. David S. Malen, radiologist who took the pictures of Teekel on March 5, 1949 and of which Dr. Williams testified and interpreted as showing a narrowing between the vertebrae, in his report as to the same pictures stated that they showed nothing ab *397 normal “in the lumbar spine and lumbar sacral region; arthritic changes involving left sacroiliac joint”. He also examined the pictures made by Dr. Mattingly on- August 5, 1947 and compared them with his and in his report stated that they' revealed “no change in the appearance of the lumbar spine. There is no evidence of fracture or of degenerative changes. The lumbar and lumbosacral curves are well maintained without any evidence of displacement of the vertebrae. The disc spaces are not narrowed.” (Emphasis added.)
Thus, Dr. Malen interpreted the pictures differently from Dr. Williams which Dr. Williams readily admitted was an honest difference of opinion.
Dr. Allen L. Segal of Samuel, Bowie & Segal, Radiologists of New Orleans, on October 21, 1947- as a result of a lumbosa-cral spine examination of Teekel reported to Dr. Irvin Cahen that the disc spaces were of average thickness and that there was no evidence of any old or recent injury.
Dr. Irvin Cahen of New Orleans, Louis.-iana, examined Teekel on October 21, 1947 and had available the x-ray pictures made by Dr. Mattingly of Baton Rouge which were reviewed as well as the pictures and report of Drs. Samuel, Bowie and Segal, and in this report Dr. Cahen stated:
“Opinion: This patient has ■ sustained two separate injuries to the lumbar area which are determined as contusion of the lumbar area sustained on July 22 and later a reactivation of this involvement plus an apparent sprain of the left ilio-lumbar zone at the second involvement.' At the present time there are still objective evidences of ilio-lumbar sprain consisting of restricted lumbar motion, paravertebral muscle spasm and positive leg tests. The examiner, however, is of the opinion that this patient reacts excessively to the examination which was utilized to determine this impairment of function. In addition, there is x-ray evidence of sacro-iliac arthritis involving 'the left articulation. The examiner feels that this arthritic involvement is of chronic duration and probably existed prior to the injury sustained.
******
“At present this patient is temporarily disabled for labor and will require additional treatment.. .This' type of involvement varies in the duration of treatment required for different individuals. ■ A minimal period of four to six months therapy is to be expected in this case. At this time the examiner does not believe that there is sufficient objective evidence to warrant myelo-graphy and is of the opinion that no disc rupture exists.”
As we understand the reports of the radiologists and their testimony, they all agree except that Dr. Williams was of the impression that he no.ted a narrowing between the intervertebral discs which was not noted by the other doctors. The x-rays taken in-1943 showed no injury to the back and neither did the x-rays taken after the alleged accident of 1947. They do show a chronic arthritis which was not connected with any alleged injury in 1947.
We therefore have a case which in its most favorable light depended upon the testimony of the plaintiff, which has been shown to be unworthy of belief. We feel that most of the District Court’s remarks are justified and at least Teekel has failed to prove that he was struck in the back by a 2 x 12 board on July 21, 1947, and if this be true, there is no medical testimony that would support his claim. He has also failed to prove any accident as of August 1, 1947.
It is further our opinion that even if we admit that Teekel did have such an accident, which was practically the same as the accident of 1943, and did get struck in the back by a 2 x 12 plank, that the preponderance of the medical testimony and the x-rays and the interpretation of these pictures if all against him. There are many inconsistencies in his testimony which we have not taken the time to detail.
We are firmly of the opinion that the plaintiff has failed to prove his case by a preponderance of the testimony as required, and the judgment of the District Court is accordingly affirmed.